FRED A. WILKIE, Petitioner-Appellee v. N.C. WILDLIFE RESOURCES COMMISSION, Respondent-Appellant

No. 9424SC339

(Filed 18 April 1995)

## 1. Public Officers and Employees § 67 (NCI4th)— wildlife enforcement officer—dismissal—whole record test—evidence insufficient

The State Personnel Commission's decision that the North Carolina Wildlife Resources Commission had met its burden of showing just cause for the dismissal of petitioner on the basis of unacceptable personal conduct was not supported by the whole record where the dismissal was based upon falsifying the hours documented on petitioner's weekly activity reports and giving false information as to his location to his supervisor, but the demands of the job required a form of falsification because officers were told by supervisors that they would work as required and answer all calls, but that they could not show or report more than 171 hours per twenty-eight day work period; officers often wrote and signed reports that were not absolutely correct in every detail; these practices were known by supervisors and sometimes directed by them due to the hour limitation; although the custom was for officers to work out of their home while staying in radio contact with Raleigh, the practice was for officers to refrain from indicating their residence as their location due to the use of scanners by hunters and lack of effectiveness if the exact location of the officer was known; and officers deviated from the policy of using signals whenever using their radios. This evidence indicates that petitioner was following what had become an accepted standard of reporting and performing work, although not strictly "by the book."

**Am Jur 2d, Civil Service § 63.**

## 2. Public Officers and Employees § 67 (NCI4th)— wildlife officer—dismissal—unacceptable personal conduct—falsified records

The State Personnel Commission erroneously concluded that the North Carolina Wildlife Resources Commission had met its burden of showing that there was just cause to dismiss petitioner based on falsified work records and giving false information on his location to his supervisor where petitioner's performance of

his duties were what had become accepted standards of reporting and performing his work and disciplinary action by his supervisors would have therefore propelled this behavior into the category of unsatisfactory job performance, for which petitioner would have been afforded certain warnings before being terminated. N.C.G.S. § 126-35.

**Am Jur 2d, Civil Service § 63.**

Appeal by respondent from order entered 7 December 1993 by Judge Forrest A. Ferrell in Watauga County Superior Court. Heard in the Court of Appeals 21 March 1995.

*Robert T. Speed for petitioner-appellee.*

*Attorney General Michael F. Easley, by Associate Attorney General Virginia A. Gibbons, for respondent-appellant.*

JOHNSON, Judge.

Petitioner Fred A. Wilkie was a sergeant in the Enforcement Division of the North Carolina Wildlife Resources Commission (respondent NCWRC) from 1 February 1974 until his dismissal on 30 April 1990. At the time of his dismissal, he held the rank of sergeant for Area 5 of District 7 which included eleven counties of Western North Carolina.

The facts underlying this dismissal are as follows: petitioner had enforcement duties as well as supervisory responsibility for three enforcement officers in his patrol area. Petitioner worked out of his home as is the custom with wildlife officers. Contact with other officers and with the Raleigh office is by radio and radio scanner. Calls for assistance and to transmit information from one officer to another are relayed via radio using "ten" signals.

Petitioner's immediate supervisor was Lieutenant Rocky Hendrix, who reported to Captain Mike Lambert. Captain Lambert had been assigned to District 7 since 1 October 1989. Captain Lambert reviewed the weekly reports and work records for officers in District 7. An officer's weekly activity report is a detailed summary of that officer's work hours, the specific breakdown of the way in which an officer spent his work time, the locations an officer worked, and the miles an officer drove. The weekly report contains several categories of hours worked, including categories for patrol activity, court hours, equipment maintenance, and hunting and boating safety programs.

Categories are also provided for, among others, training given and received, wildlife service pickups, nongame wildlife, special investigations, game management, accident investigation, and administrative and office work. The office work category is used when an officer is doing paperwork which pertains to his own work detail, i.e., completion of his own weekly activity reports. The administrative work category is used when an officer is reviewing the paperwork submitted by other officers. An officer signs below a statement on the weekly report which reads as follows: "This is a true and accurate report of work performed during this time period."

Despite the signing of this statement, other officers in the District indicated that the demands of the job required a form of falsification. Officers were told by supervisors that they would work as required and answer all calls, but they could not show or report more than 171 hours per twenty-eight day work period. Officers often wrote and signed reports that were not absolutely correct in every detail; these practices were known by supervisors and sometimes directed by them, because only a certain number of hours could be reported within a twenty-eight day work period.

The practice was for officers to commonly refrain from indicating their residence as their location and give a town instead. This was due to the use of scanners by hunters and lack of effectiveness if the exact location of the officer was known. Additionally, although respondent NCWRC had established a policy requiring officers to use signals whenever using their radios, it appeared that officers in District 7 and other districts deviated from this policy.

Petitioner was described as being hardworking, always available to assist officers needing help, and working as hard or harder than most workers in the District. The number of arrests made by petitioner was in the upper 25% of the District, his total number of cases was higher than anyone in the District, and officers that he supervised were performing their duties satisfactorily.

Petitioner stated he had never worked less than the required 160 hours in a pay period without taking vacation time in that period. Petitioner acknowledged that his weekly reports may not reflect the exact hours worked, but this is due to the fact that his interest was in enforcing the law and he never regarded paperwork as a matter of high priority. Petitioner normally did his reports on Sunday night or Monday and did not keep daily notes of his activities. Petitioner frequently guessed at his hours when making out a weekly report, and

the inaccuracies frequently included omissions of hours worked at night as well as the exact or particular hours that he did work.

It was Captain Lambert's practice to monitor the entire District by monitoring his radio to determine if his officers were working. If a day or two passed and an officer had not been heard on the radio, yet his weekly reports showed him working during those days, Captain Lambert had reason to wonder where the officer was when he did not respond to radio calls. Captain Lambert suspected that petitioner was being untruthful in his weekly reports and location reports, so he decided to put petitioner under surveillance.

The officers assigned to the surveillance detail were Lieutenant Tony Lewis and Sergeant Doran Robbins, from District 8. Captain Lambert randomly selected dates from petitioner's work schedule. Captain Lambert gave the dates to Lieutenant Lewis and told him to set up the surveillance detail near petitioner's residence and to note his comings and goings.

Two or three days prior to 14 March 1990, Lieutenant Lewis and Sergeant Robbins went to Watauga County to set up the surveillance. At petitioner's residence, they saw a clothesline in the backyard with wildlife shirts hanging on it. They also saw a Blazer with state license tag PV3921 parked in the yard. The road into petitioner's residence deadended and did not come out anywhere by vehicle except on Highway 421.

On 14 March 1990, Lieutenant Lewis and Sergeant Robbins began their surveillance detail at 8:00 a.m. At 10:25 a.m., they saw petitioner come out of his driveway in his Blazer and turn left onto Highway 421 toward Deep Gap. Lieutenant Lewis and Sergeant Robbins followed petitioner toward Boone. At 10:40 a.m., petitioner received a radio call stating that someone was on Beech Creek with fishing gear and a truck was stocking fish on Beech Creek. Petitioner continued through Boone and turned left onto Highway 105 toward Avery County. He appeared to be checking fishing on the Watauga River. Lieutenant Lewis and Sergeant Robbins continued to follow petitioner until he passed Valle Crucis Road. At 11:16 a.m., they stopped following petitioner and returned to their original position near State Road 1612 adjacent to Highway 421. At 2:33 p.m., petitioner returned to his home until 3:35 p.m. Petitioner left home at that time and went to the Post Office on State Road 1612. Lieutenant Lewis and Sergeant Robbins followed him to Fleetwood and Jefferson. When petitioner headed

toward Lansing, they returned to his residence. Lieutenant Lewis and Sergeant Robbins ended the surveillance at that time.

On 18 March 1990, at 7:30 a.m., Lieutenant Lewis and Sergeant Robbins walked from the Parkway through the woods to petitioner's residence where Lieutenant Lewis saw the Blazer parked at the residence. At 11:03 a.m., they heard Raleigh call petitioner's call number two or three times without response. They then heard Lieutenant Hendrix answer the Raleigh call. Petitioner responded at the same time. In the course of the radio conversation, Lieutenant Hendrix asked petitioner for his location; petitioner told Lieutenant Hendrix that he was just north of Deep Gap. Lieutenant Lewis and Sergeant Robbins had not seen petitioner drive out of his driveway. At 11:45 a.m., they saw him leave his residence. Petitioner went to the Parkway and drove north. Lieutenant Lewis and Sergeant Robbins did not follow petitioner at this time; they heard petitioner give a radio call of ten-eight at 1:12 p.m. which meant he was "in-service." At 2:48 p.m., petitioner again gave a radio call of ten-eight, and again at 3:59 p.m. At 4:15 p.m., petitioner returned home. Lieutenant Lewis and Sergeant Robbins stayed at their location until 7:10 p.m. and did not see petitioner again that date. They also monitored radio traffic and heard Raleigh call for petitioner at 6:00 p.m.; petitioner did not respond.

The next surveillance date was 26 March 1990. Sergeant Robbins began the surveillance alone at approximately 7:15 a.m. When Sergeant Robbins arrived, he went through the woods to the house where he had previously seen petitioner and saw petitioner's Blazer parked there. Lieutenant Lewis arrived at the observation point near petitioner's residence at 2:00 p.m. At 3:18 p.m., petitioner came out of his residence in his Blazer. This was the only time either officer saw petitioner on 26 March 1990. Petitioner returned at 6:25 p.m.

On 30 March 1990, Lieutenant Lewis and Sergeant Robbins arrived at their observation point at 7:30 a.m. Lieutenant Lewis walked back into the woods to petitioner's residence. At 9:17 a.m., petitioner left his residence in his Blazer and drove to Deep Gap and then on toward Boone. Lieutenant Lewis and Sergeant Robbins followed petitioner back to the Parkway and then at 9:40 a.m. left him to return to their original location. At 11:30 a.m., they heard petitioner give a ten-eight radio call. At 4:45 p.m., petitioner and Officer Dennis Thomas drove into petitioner's driveway. Officer Thomas left at 5:57

p.m. Lieutenant Lewis and Sergeant Robbins ended their surveillance at 7:30 p.m. and did not see petitioner any other time that day.

On 31 March 1990, Sergeant Robbins and Lieutenant R. W. Lequire worked the surveillance detail together. They arrived at 7:30 a.m. They saw petitioner leave at 9:30 a.m. and return at approximately 10:30 or 11:00 a.m. At this time petitioner did not turn into the road that leads to his house, but drove past. Petitioner returned to his residence at 2:00 p.m. Sergeant Robbins did not see petitioner again that day. Lieutenant Lequire saw petitioner at 6:50 p.m. when Lieutenant Lequire walked from the Parkway and saw petitioner working around his house. The detail concluded at approximately 7:30 p.m.

Lieutenant Lequire compiled a written report of the findings the surveillance team had gathered. Captain Lambert compared petitioner's weekly reports to the same dates of the surveillance detail.

On 14 March 1990, petitioner's report showed that he left home at 9:00 a.m. and returned to his residence at 7:00 p.m., categorized as 9 hours fishing patrol. However, the surveillance report showed petitioner left his home at 10:25 a.m., gave no radio call, returned to his home at 2:33 p.m., left again at 3:35 p.m., and returned at 7:40 p.m. Petitioner had given an in-service radio call in 1:26 p.m., but no location was given. The surveillance report showed petitioner working 7.21 hours.

On 18 March 1990, petitioner reported working 6 hours of fishing patrol. Lieutenant Lequire's information showed petitioner working 3.5 hours. On 26 March 1990, petitioner reported working 8.5 hours on fishing patrol and 2 hours on office work. Lieutenant Lequire's information showed that petitioner left his residence at 3:18 p.m. and returned at 6:25 p.m., for a total of only 3.12 hours.

On 30 March 1990, petitioner reported 2 hours of hunting patrol and 7 hours of fishing patrol. According to the surveillance report, petitioner worked 6.47 hours. On 31 March 1990, petitioner reported 9 hours of patrol work ("patrol work" means away from the residence). The surveillance report showed petitioner working 4.11 hours.

On one of the dates of surveillance, petitioner was called on the radio by Lieutenant Hendrix who asked him, using radio code, where he was located. Petitioner radioed back to Lieutenant Hendrix that he was "just north of Deep Gap." According to the surveillance report,

WILKIE v. N.C. WILDLIFE RESOURCES COMMISSION

[118 N.C. App. 475 (1995)]

petitioner was not just north of Deep Gap, but was south of Deep Gap at his residence.

Lieutenant Hendrix was called to the Raleigh office in early April 1990 for his own predismissal conference. At that time, Captain Lambert presented the surveillance information to Lieutenant Hendrix. Lieutenant Hendrix had no knowledge of the surveillance or disciplinary action concerning petitioner, even though he was petitioner's immediate supervisor. Captain Lambert recommended petitioner's dismissal based on his review of the weekly reports and Lieutenant Lequire's compilation. Captain Lambert concluded that petitioner had falsified the hours shown as work time and the locations patrolled.

After receiving Major C. J. Smith and Colonel W. H. Ragland's recommendations to dismiss petitioner, Captain Lambert instructed Lieutenant Hendrix to have petitioner present for a predismissal conference on 16 April 1990. Captain Lambert, Lieutenant Lequire, Lieutenant Hendrix, and petitioner were present; the conference was conducted by Captain Lambert. Captain Lambert gave the predismissal conference document to petitioner and read it to him, and gave petitioner an opportunity to respond.

Petitioner gave a lengthy response to the allegations. Petitioner was informed that he could submit additional responses in writing and that any final action on his dismissal would be delayed until his response could be considered. Petitioner was told that he would be given a written decision on 30 April 1990.

Charles R. Fullwood, respondent NCWRC's executive director, approved the staff recommendation to terminate petitioner on 30 April 1990. The specific instances of alleged misconduct for which he had been dismissed included falsifying the hours documented on his weekly activity reports and giving false information to his supervisor, and giving false information on his location to his supervisor.

Petitioner filed a petition for a contested case hearing with the Office of Administrative Hearings (OAH) on 6 May 1991. An evidentiary hearing was held before Administrative Law Judge Sammie Chess, Jr. on 2 December 1991. Judge Chess filed a recommended decision on 20 April 1991 that petitioner's dismissal be reversed, and that petitioner be reinstated and awarded back pay as well as attorney's fees.

The full State Personnel Commission (SPC) rejected the findings and conclusions of Judge Chess, concluding that respondent NCWRC had met its burden of showing just cause for the dismissal of petitioner on the basis of unacceptable personal conduct. The decision and order of the SPC, entered on 21 October 1992, affirmed the dismissal of petitioner by respondent NCWRC.

Petitioner filed a petition for judicial review on 25 November 1992 in Watauga County Superior Court. On 7 December 1993, Superior Court Judge Forrest A. Ferrell ordered that the decision of the SPC be reversed and that the matter be remanded to the SPC for further action in compliance with the order. Further, Judge Ferrell ordered that petitioner be awarded attorney's fees, and respondent NCWRC be ordered to pay costs. Respondent NCWRC has appealed to our Court.

[1] Respondent NCWRC presents two arguments on appeal. First, respondent NCWRC argues that there is substantial evidence in the record supporting the findings of fact and conclusions of law contained in the decision and order of the SPC.

North Carolina General Statutes § 150B-51 states the standard of review for this Court when reviewing a decision of the SPC:

[t]he court reviewing a final decision may affirm the decision of the agency or remand the case for further proceedings. It may also reverse or modify the agency's decision if the substantial rights of the petitioners may have been prejudiced because the agency's findings, inferences, conclusions, or decisions are:

(1) In violation of constitutional provisions;

(2) In excess of the statutory authority or jurisdiction of the agency;

(3) Made upon unlawful procedure;

(4) Affected by other error of law;

(5) Unsupported by substantial evidence . . . in view of the entire record as submitted; or

(6) Arbitrary or capricious.

North Carolina General Statutes § 150B-51 (1991). If the issue on appeal is whether the agency decision was supported by the evidence, or was arbitrary or capricious, our Court employs the "whole

record" test. *See Walker v. N.C. Dept. of Human Resources*, 100 N.C. App. 498, 397 S.E.2d 350 (1990), *disc. review and supersedeas denied*, 328 N.C. 98, 402 S.E.2d 430 (1991). This requires our Court to examine all of the competent evidence in determining whether there is substantial evidence to support the SPC's findings and conclusions; if substantial evidence in the record does not support an agency decision, it may be reversed. *Id.*

We have conducted a review of the record in this case and find that the SPC's decision *was* unsupported by substantial evidence in view of the entire record as submitted. We note that "the 'whole record' test does not allow the reviewing court to replace the Board's judgment as between two reasonably conflicting views, even though the court could justifiably have reached a different result had the matter been before it *de novo*[.]" *Thompson v. Board of Education*, 292 N.C. 406, 410, 233 S.E.2d 538, 541 (1977). However, we cannot ignore Judge Chess' findings regarding the manner in which the officers in the District had come to report and perform their work; i.e., that the demands of the job required a form of falsification because officers were told by supervisors that they would work as required and answer all calls, but they could not show or report more than 171 hours per twenty-eight day work period; that officers often wrote and signed reports that were not absolutely correct in every detail, and these practices were known by supervisors and sometimes directed by them, because only a certain number of hours could be reported within a twenty-eight day work period; that the practice was for officers to commonly refrain from indicating their residence as their location and give a town instead, due to the use of scanners by hunters and lack of effectiveness if the exact location of the officer was known; and that although respondent NCWRC had established a policy requiring officers to use signals whenever using their radios, it appeared that officers in District 7 and other districts deviated from this policy. This evidence indicates that petitioner was following what had become, during his years as a wildlife officer, an accepted standard of reporting and performing work, although not strictly "by the book." This observation is buttressed by evidence that petitioner's own supervisor had a predismissal conference conducted by Captain Lambert. Therefore, a review of the "whole record" compels us to reach the result that the SPC's decision was not supported by the entire record.

[2] Respondent NCWRC next argues that they followed correct procedure in the dismissal of petitioner for unacceptable personal con-

duct and did not violate his right to procedural due process. Specifically, respondent NCWRC argues that the SPC properly concluded that respondent NCWRC had met its burden of showing that there was just cause to dismiss petitioner.

North Carolina General Statutes § 126-35 (1993) states that "[n]o career State employee subject to the State Personnel Act shall be discharged, suspended, or demoted for disciplinary reasons, except for just cause." Two classifications which will warrant disciplinary action are (1) unsatisfactory job performance and (2) unacceptable personal conduct. *Id.* Referencing both the State Personnel Manual and the N.C. Admin. Code, our Court has stated that "[c]ertain warnings are . . . required before a permanent State employee may be terminated on the grounds of unsatisfactory job performance . . . while none are required for dismissals based on an employee's personal (mis)conduct." *Amanini v. N.C. Dept. of Human Resources,* 114 N.C. App. 668, 679, 443 S.E.2d 114, 121 (1994).

As we concluded earlier, our review of the whole record indicates that *in this case,* petitioner's performance of his duties as a wildlife officer were what had become accepted standards of reporting and performing his work. As such, disciplinary action by his supervisors to halt these accepted standards would have propelled this behavior into the "unsatisfactory job performance" category rather than the "unacceptable personal conduct" category. In that event, petitioner would have been afforded certain warnings before being terminated on the grounds of unsatisfactory job performance. Therefore, we find the SPC improperly concluded that respondent NCWRC had met its burden of showing that there was just cause to dismiss petitioner.

Because we have found that the SPC's decision was not supported by the whole record, and that the SPC improperly concluded that respondent NCWRC had met its burden of showing that there was just cause to dismiss petitioner, we affirm the decision of the trial court.

Affirmed.

Judges COZORT and MARTIN, JOHN C. concur.